**BRINK'S LIMITED, Plaintiff–Appellant,**

v.

**SOUTH AFRICAN AIRWAYS, Defendant–Appellee.**

No. 1172, Docket 95–7872.

United States Court of Appeals, Second Circuit.

Argued May 15, 1996.

Decided Aug. 8, 1996.

Craig S. English, New York City (Thomas C. Murphy, Kennedy Lillis Schmidt & En-

glish, New York City, of counsel), for Appellant.

Michael I. Verde, New York City (Franklin F. Bass, Kathleen E. Schaaf, Rosenman & Colin, New York City, of counsel), for Appellee.

Stephen J. Fearon, Michael J. Holland, Katherine B. Posner, Robert J. Saville, Condon & Forsyth, New York City, for Amicus Curiae Qantas Airways Limited and Finnair OY.

Before: LUMBARD, MESKILL and MINER, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiff-appellant Brink's Limited (Brink's) appeals from a decision of the United States District Court for the Southern District of New York, Baer, *J.*, granting defendant-appellee South African Airways' motion for partial summary judgment and entering judgment against South African Airways (SAA) in the amount of $1,522. We conclude that the district court erred in applying New York law under Article 25 of the Convention for Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. 876 (1934), *reprinted in* note following 49 U.S.C.A. § 1502 (the "Warsaw Convention" or the "Convention"). We also conclude that the district court erred in its application of Articles 8 and 9 of the Warsaw Convention, but nevertheless reached the proper conclusion as to liability under those articles. Therefore, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

## BACKGROUND

Extensive discovery produced the following background information. Defendant-appellee SAA is a division of Transnet Limited, which is wholly owned by the government of the Republic of South Africa. Rustenberg Platinum Mines Limited (Rustenberg) contracted for SAA to transport certain precious metals by air from Johannesburg to New York under an air waybill [1] dated September 10, 1992. Rustenberg also contracted for plaintiff-appellant Brink's to provide security for the shipment and to indemnify Rustenberg for any losses. As consignee under the SAA–Rustenberg air waybill, Brink's commenced this action against SAA, contending that six boxes of the shipment were stolen while in the custody of SAA.[2]

On September 10, 1992, Rustenberg loaded an armored car with the shipment of precious metals bound for New York, London and another refinery within South Africa. At approximately 1:10 p.m., the armored car arrived at the high value cargo vault located within the SAA cargo facility at Jan Smuts Airport in Johannesburg. There, an SAA employee unloaded the shipment under the watch of the armored car driver and the South African Police (SAP), which acted as security for SAA.

Thirty-four boxes were counted by the courier for the shipment (General Malan), the SAP officer assigned to the vault (Sergeant Engelbrecht), the vault foreman, another SAP officer and an employee of the freight forwarding company. Thereafter, the boxes were marked with air waybill labels and placed in an all-metal container, designated AVE 1617, bound for New York.

After padlocks were affixed to the container, Sergeant Engelbrecht, who had previously complained to SAA regarding poor locking mechanisms on the containers used for high value shipments, noticed that despite the padlock, the door to AVE 1617 still could be opened. He informed General Malan of the problem and requested the vault foreman to provide a container that could be locked. The vault foreman advised him that no other containers were available. Thereafter, SAP

---

**1.** An air waybill is a written document describing the shipping arrangement between the air carrier and the shipper. It includes, *inter alia*, the point of origin and destination and a description of the goods included in the shipment. *See* Warsaw Convention, Arts. 5–16; *see also* Black's Law Dictionary 1593 (6th ed. 1990).

**2.** Article 13(3) authorizes the consignee "to put into force against the carrier the rights which flow from the contract of transportation." Warsaw Convention, Art. 13(3).

and SAA personnel closed and locked the high value cargo vault.

At approximately 6:15 that evening, SAA personnel opened the vault, removed container AVE 1617, loaded it on a dolly and transported it from the cargo facility to SAA Flight 201, destined for New York. An armed SAP escort, including General Malan, accompanied the container. After arrival at the aircraft, General Malan, allegedly in contravention of SAA procedures, returned to the passenger lounge. After General Malan's departure, only one security officer, Constable Ramoroka, remained planeside to guard the shipment.

Constable Ramoroka had been guarding a gate at the airport when he was directed to act as the armed guard at the aircraft. He had never guarded a high value shipment on the ramp or at planeside, and was not at all familiar with the contents or appearance of this shipment.

SAA cargo loaders Jose Rheeder and Richard Capkey loaded the shipment on board. Except for a two-to-three minute interval, SAA loadmaster Scholtz Potgeiter supervised the loading process. After container AVE 1617 was loaded into the hold, Constable Ramoroka positioned himself under the wing of the aircraft where he allegedly could not see the stowage location of the container. It took 20 to 60 minutes to load the remaining cargo into the hold. Then container AVE 1617 was "buried" in the hold.

The aircraft departed Jan Smuts Airport at 8:08 p.m. It stopped for a regularly scheduled refueling at Ilha Do Sal in the Cape Verde Islands.[3] Although cargo was removed from the front holds in Ilha Do Sal, no cargo was removed from the hold containing AVE 1617. Except for a two-to-three minute period, General Malan continuously observed the hatch to that hold and verified that it was not opened.

3. Although the air waybill did not identify Ilha Do Sal specifically in the "Routing and destination" space, the reverse side of the air waybill provided, in part:

The agreed stopping places (which may be altered by Carrier in case of necessity) are those places, except the place of departure and

The aircraft arrived at John F. Kennedy International Airport at approximately 6:30 the following morning. SAA security personnel met the aircraft, obtained the padlock keys from General Malan, and proceeded rampside, where the hold containing AVE 1617 had been opened but not off-loaded. The SAA personnel observed the off-loading of AVE 1617 and confirmed that the locks and seals were intact. Both the SAA personnel and Port Authority police escorted the container to a cargo facility, where Brink's personnel opened the container and immediately determined that six boxes of the precious metals, worth $1,789,012.67, were missing from the shipment.

The Port Authority police, SAA and the Gold and Diamond Branch of the SAP have investigated the disappearance of the five boxes. Despite an apparently thorough investigation, there have been no arrests or convictions and the boxes have not been recovered. Although SAP bulletins posted an award to refiners handling similar materials, no sale or attempted sale was ever reported. Under its agreement with Rustenberg, Brink's indemnified Rustenberg for the entire loss.

In the proceedings below, Brink's sought to impose liability for the entire loss on SAA. SAA admitted only limited liability, and moved for partial summary judgment to the extent that Brink's sought damages above the liability limitation imposed by Article 22(2) of the Warsaw Convention. The district court granted partial summary judgment to SAA and entered a final judgment against SAA for $1,522, the limited liability amount. This appeal followed.

## DISCUSSION

This case is governed by the Warsaw Convention and the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–1611 (FSIA).[4] The Warsaw Convention provides

the place of destination, set forth on the face hereof or shown in Carrier's timetables as scheduled stopping places for the route.
Brink's concedes that the pertinent SAA timetable lists a stopover in the Cape Verde Islands.

4. The FSIA confers jurisdiction over foreign states. *See* 28 U.S.C. § 1330 (granting jurisdic-

the cause of action, *see* Warsaw Convention, Arts. 13(3) & 18, but the FSIA provides the sole basis of federal court jurisdiction, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989). We apply the Warsaw Convention and the FSIA concurrently. *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002 (9th Cir.1987). We have appellate jurisdiction under 28 U.S.C. § 1291.

Brink's contends that SAA is liable for the full value of the missing cargo under three theories of liability. First, Brink's contends that the wilful misconduct of SAA employees, in stealing the boxes, deprives SAA of limited liability under Article 25 of the Convention. Second, Brink's contends that even absent theft, the conduct of SAA employees constitutes wilful misconduct under the totality of the circumstances and deprives SAA of limited liability under Article 25 of the Convention. Third, Brink's contends that SAA's failure to comply with the requirements of Article 8 of the Convention regarding air waybills also deprives SAA of limited liability under Article 9 of the Convention.

SAA's response is threefold. First, SAA contends that the evidence is insufficient to support the allegation of theft by SAA employees and that even if theft could be proven, employee theft is not wilful misconduct within the meaning of Article 25. Second, SAA contends that Brink's' "totality of the circumstances" claim is not sufficient to create an inference of wilful misconduct. Finally, SAA contends that its incorporation of certain information by reference to documents outside the air waybill satisfied the requirements of Article 8 of the Convention.

■ Our interpretation of the Warsaw Convention must begin "with the literal language." *Buonocore v. Trans World Airlines*, 900 F.2d 8, 9 (2d Cir.1990). If the language is "reasonably susceptible of only one interpretation," our task of interpretation ends there. *Id.* at 9–10; *see also Victoria Sales Corp. v. Emery Air Freight*, 917 F.2d 705, 707 (2d Cir.1990) (stating that "when the text

of a treaty is clear, a court shall not, through interpretation, alter or amend the treaty" (citing *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134, 109 S.Ct. 1676, 1683–84, 104 L.Ed.2d 113 (1989))). We may apply secondary tools of interpretation only when the treaty text is ambiguous. *Chan*, 490 U.S. at 134, 109 S.Ct. at 1683–84.

## I. *Wilful Misconduct*

This appeal requires us to determine whether Article 25 of the Warsaw Convention—which deprives a carrier of limited liability for damage caused by its "dol," as the original French text provides, or by its "wilful misconduct," as the English translation provides—embraces an international standard of conduct or defers to the law of the forum jurisdiction for its definition of wilful misconduct. If Article 25 defers to the law of the forum jurisdiction, in this case the United States, we must determine whether a federal statute, federal common law or state law governs this controversy. We then must apply the appropriate choice of law rules and determine what law, in fact, defines the content of wilful misconduct.

### A. *The "law of the court to which the case is submitted"*

Article 18 of the Warsaw Convention presumes an air carrier liable for loss or damage to goods in transit, but Article 22(2) limits that liability to 250 francs per kilogram, or approximately $9.07 per pound. Warsaw Convention, Arts. 18, 22(2). However, under Article 25(1) and (2), the Convention eliminates the limitation of liability where the wilful misconduct of the carrier causes the loss or damage. *Id.*, Art. 25(1) & (2). Under that Article, a complaining party must prove both wilful misconduct and proximate cause in order to avoid the general rule of limited liability.

Specifically, Article 25, as translated, states:

(1) The carrier shall not be entitled to avail himself of the provisions of this con-

tion over certain claims against foreign states). Because SAA is an instrumentality of the government of South Africa, or a separate legal entity owned by the Republic of South Africa and not a

citizen of the United States, SAA is a foreign state within the meaning of the FSIA. 28 U.S.C. § 1603(b). The FSIA therefore applies to this dispute.

vention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default .on his part as, *in accordance with the law of the court to which the case is submitted,* is considered to be equivalent to wilful misconduct.

(2) *Similarly* the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.

*Id.,* Art. 25(1) & (2) (emphases added). Thus, Article 25(2) makes it clear that an air carrier is liable for the wilful misconduct of its employees acting within the scope of their employment. More pertinently, Article 25(1) makes it clear that wilful misconduct must be defined "in accordance with the law of the court to which the case is submitted." *Id.,* Art. 25(1).

The language of Article 25(1), adopted in subsection (2) by use of the word "similarly," is clear. The only reasonable interpretation of the reference to "the law of the court to which the case is submitted" is as a reference to the law of the forum jurisdiction. More importantly, the only reasonable construction of Article 25's reference to the law of the forum jurisdiction is deference to that law for the purposes of defining "dol" or "wilful misconduct." In other words, Article 25 unambiguously deprives an air carrier of limited liability for damage caused by its "dol," or that which is "considered to be equivalent" to "dol," interpreted as "wilful misconduct," under the law of the forum jurisdiction. *Id.,* Art. 25(1).

Because we conclude that the language of Article 25(1) clearly calls for the application of the law of the forum jurisdiction, we must reject the "international" interpretation of Article 25 advanced by Brink's. In other words, because Article 25(1) unambiguously defers to the law of the forum jurisdiction for the *content* of "wilful misconduct," we must reject any notion that this language is merely a reference to local terminology or, as Brink's describes it, a vehicle for translating the difficult civil concept of "dol."

■ Although we recognize that the term "dol," or "wilful misconduct," as we have translated it, is a civil law concept, and one that is not readily capable of translation, the conflict over the content of "wilful misconduct" arises out of conflicting policies, not difficulty of translation. *Compare Rustenberg Platinum Mines, Ltd. v. South African Airways,* [1979] 1 Lloyd's Rep. 19, 23 (Eng.C.A.) (concluding that an employee who commits theft while carrying out functions entrusted to him is acting within the scope of his employment), *with Rymanowski v. Pan Am. World Airways,* 70 A.D.2d 738, 739, 416 N.Y.S.2d 1018, 1020 (3d Dep't 1979) (concluding that an employee who commits theft is not acting within the scope of his employment because acts such as theft are not committed in furtherance of the employee's duties), *aff'd,* 49 N.Y.2d 834, 427 N.Y.S.2d 795, 404 N.E.2d 1336 (1980). In other words, we believe that the drafters of the Convention recognized the possibility of conflicting national policies with respect to imputing liability to a carrier, but unmistakably resolved any conflict by deferring to the law of the forum jurisdiction.

Even were we to ignore the plain language of Article 25 and conclude that the difficulty of interpreting the term "dol" alone justified resort to interpretive techniques, traditional interpretive techniques do not support the concept of an international standard advanced by Brink's. First, the participants at the Warsaw Convention were not ignorant of the widely divergent laws governing liability for the acts of servants. As one scholar relied upon by Brink's noted, the participants to the Convention appreciated the difficulty of determining what acts should be imputed to a carrier but did not draw any lines. H. Drion, *Limitation of Liabilities in International Air Law* ¶¶ 205–206, at 248 (1954).

Second, the minutes of the Warsaw Convention offer "little guidance" on the ultimate question presented here—the liability of an employer for the acts of an employee. *Id.* ¶ 206. Third, the international authorities cited by Brink's similarly offer little guidance to American courts. Although these authorities universally conclude that theft by an employee must be imputed to the employer for purposes of liability, they do not address the question of which body of law governs

under Article 25, presumably because no real conflict arose in those cases. *See, e.g., Rustenberg Platinum Mines, Ltd. v. South African Airways,* [1979] 1 Lloyd's Rep. 19, 23 (Eng.C.A.) (concluding that English courts share view generally accepted in other countries that a master is liable for the acts committed by a servant in the course of carrying out the duties entrusted to him). Finally, although the participants to the Warsaw Convention desired uniformity, and although the opinions of sister signatories are entitled to considerable weight, *Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 1344–45, 84 L.Ed.2d 289 (1985) (quoting *Benjamins* v. *British European Airways,* 572 F.2d 913, 919 (2d Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979)), the participants in the Convention recognized that uniformity was not always possible, and thus, envisioned application of local law to certain questions. *See Zicherman v. Korean Air Lines Co., Ltd.,* — U.S. —, —, 116 S.Ct. 629, 635, 133 L.Ed.2d 596 (1996) (noting incontrovertible application of national law to certain issues and infeasibility of uniformity under Article 24).

In short, the literal language of Article 25 refers to the law of the forum jurisdiction for a determination of what conduct constitutes wilful misconduct by an air carrier. Moreover, even traditional interpretive techniques, foreclosed by the clarity of Article 25, would not produce a definitive, let alone contrary, interpretation of Article 25. Thus, the law of the United States determines what conduct will deprive an air carrier of limited liability protection.

### B. *United States Law for Purposes of Article 25*

The next question we must answer is *what* is the law of the United States for purposes of Article 25. The United States Congress has not enacted any legislation addressing the precise issue here. Thus, the question becomes whether the courts of the United States should develop and apply federal common law or whether state law provides a governing rule. In making this determination, we are mindful that the Supreme Court recently admonished lower courts to refrain

from developing federal common law "under cover" of advancing the goal of uniformity in Warsaw Convention cases. *See Zicherman,* — U.S. at —, 116 S.Ct. at 636.

In *Zicherman,* the Supreme Court interpreted Article 24 of the Convention as leaving the question of available remedies unresolved. *Id.* at —, 116 S.Ct. at 635. The Court held that Article 24 defers to private international law for resolution of those questions. *Id.* More specifically, the Court characterized Article 24 as a "pass-through," directing courts to apply the law that would govern in the absence of the Warsaw Convention. *Id.* at —, 116 S.Ct. at 636. In *Zicherman,* a federal statute (the Death on the High Seas Act) supplied the rule of law. *Id.* at —, 116 S.Ct. at 636.

More pertinently, the *Zicherman* Court reversed this Court's holding that federal common law, specifically general maritime law, governed such causes of action. *Id.* at —, 116 S.Ct. at 636 (*rev'g Zicherman v. Korean Air Lines Co., Ltd.,* 43 F.3d 18, 21 (2d Cir.1994) (following *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988,* 928 F.2d 1267 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991), & *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,* 37 F.3d 804 (2d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995))). The Court cautioned that, notwithstanding any desire for uniformity, the Warsaw Convention does not empower United States federal courts "to develop some common-law rule—under cover of general admiralty law or otherwise—that will supersede the normal federal disposition." *Zicherman,* — U.S. at —, 116 S.Ct. at 636.

Thus, the Warsaw Convention does not authorize creation of an international or federal common law "in derogation of otherwise applicable law." *Id.* Rather, where the drafters declined to enact a substantive rule of law within the Convention, the Convention merely acts as a "pass-through," directing courts to apply the law that would govern in the absence of the Warsaw Convention. *Id.* Accordingly, we refrain from fashioning a federal common law rule in this case.

In the ordinary diversity case, federal courts would apply the law of the forum in which the court is located. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In this case, however, the FSIA provides the sole basis of federal court jurisdiction. *Argentine Republic,* 488 U.S. at 443, 109 S.Ct. at 693. Nevertheless, state law generally controls in FSIA cases as well. *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959 (2d Cir.1991). More specifically, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2597–98 n. 11, 77 L.Ed.2d 46 (1983).

Here, an international treaty governs liability between the parties to this lawsuit. However, that treaty defers to the law of the United States. Thus, we "pass-through" the Warsaw Convention to United States law and, under the FSIA, to state law for the rule of liability governing this dispute. *See Zicherman,* —— U.S. at ——, 116 S.Ct. at 636 (suggesting that where Warsaw Convention does not supply a rule of law, the Warsaw Convention acts as a "pass-through" to otherwise applicable law); *First Nat'l City Bank,* 462 U.S. at 622 n. 11, 103 S.Ct. at 2597–98 n. 11 (concluding that the FSIA requires application of state law if state law provides a rule of liability).

In short, Article 25 of the Warsaw Convention defers to the law of the forum jurisdiction for a determination of what conduct constitutes "wilful misconduct" by an air carrier. When a Warsaw Convention action is filed in a United States district court and no federal statute governs, the law of the United States for purposes of Article 25 is the law of the state in which the district court sits.

In applying the law of the forum jurisdiction, federal courts must also apply that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941) (involving diversity case); *see also Zicherman,* —— U.S. at ——, 116 S.Ct. at 635

(noting that, in determining which *sovereign's* law applies, "[c]hoice of law is, of course, determined by the forum jurisdiction"); *Barkanic,* 923 F.2d at 961 (holding that the FSIA incorporates state choice of law rules). *But see Bickel v. Korean Air Lines Co., Ltd.,* 83 F.3d 127, 130–31 (6th Cir.1996) (developing and applying a federal choice of law rule to Article 24 of the Warsaw Convention). Because this action was instituted in the United States District Court for the Southern District of New York, New York law, including New York choice of law rules, controls.

### C. *Choice of Law*

The next question for us is what law New York state courts would apply to the issue in dispute. We need not determine which particular New York choice of law rule, tort or contract, applies in this context because we conclude that New York state courts would apply South African law under either choice of law analysis.

Until the latter part of this century, New York courts employed a "traditional, 'territorially oriented' approach to choice-of-law issues which applied the law of the geographical place where one key event occurred, such as the place of the wrong in tort cases or where an agreement was entered into or performed in contract cases." *Istim, Inc. v. Chemical Bank,* 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 798, 581 N.E.2d 1042, 1044 (1991). More recently, however, New York courts, recognizing that "[a] State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair," abandoned these rigid rules in favor of a more flexible approach. *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 70–71, 595 N.Y.S.2d 919, 921, 612 N.E.2d 277, 279 (1993). Under this more flexible approach, New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute. *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283–84 (1963).

In contract cases, New York courts now apply a "center of gravity" or "grouping of contacts" approach. *Id.* Under this ap-

proach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936, 940 (1993). New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Id.* at 226, 597 N.Y.S.2d at 907, 613 N.E.2d at 939. The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. *Id.*

In tort cases, New York courts apply an "interests" analysis. *Istim, Inc.,* 78 N.Y.2d at 347–48, 575 N.Y.S.2d at 798, 581 N.E.2d at 1044. Courts must examine the purposes and policies of the conflicting laws in the context of the facts of the case. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney,* 81 N.Y.2d at 72, 595 N.Y.S.2d at 922, 612 N.E.2d at 280. If post-event remedial rules, or loss-allocating rules, are at issue, "other factors are taken into consideration, chiefly the parties' domiciles." *Id.* In short, "interests analysis" determines "which State has the greater interest in having its law applied." *Istim, Inc.,* 78 N.Y.2d at 348, 575 N.Y.S.2d at 798, 581 N.E.2d at 1044.

When choice of law analysis calls for application of foreign law which would " 'violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal' . . ., the court may refuse to enforce it." *Cooney,* 81 N.Y.2d at 78, 595 N.Y.S.2d at 926, 612 N.E.2d at 284 (quoting *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918)). However, not all New York statutes or cases express fundamental public

policy. *Id.* at 79, 595 N.Y.S.2d at 926, 612 N.E.2d at 284. "[R]esort to the public policy exception should be reserved for those foreign laws that are truly obnoxious." *Id.* at 79, 595 N.Y.S.2d at 927, 612 N.E.2d at 285. More pertinently, this exception applies "only when New York's nexus with the case is substantial enough [that applying the foreign law would] threaten [New York] public policy." *Id.* at 78, 595 N.Y.S.2d at 926, 612 N.E.2d at 284.

This case, essentially an action for indemnification, arises from a contract for carriage of goods between a shipper and an air carrier. The Warsaw Convention, an international treaty governing the liability of air carriers, provides the cause of action. That treaty deprives an air carrier of its limited liability protection for damage caused by the wilful misconduct of its employees. However, that treaty refers to the law of the forum jurisdiction for a determination of whether theft by an employee acting within the scope of employment constitutes wilful misconduct by the air carrier.

We need not decide whether this context requires application of contract choice of law principles or tort choice of law principles, or, assuming the latter, whether the applicable law is one of conduct regulation or loss allocation. Under any analysis, the Republic of South Africa clearly is the center of gravity of this dispute, *Allstate Ins.,* 81 N.Y.2d at 227, 597 N.Y.S.2d at 908, 613 N.E.2d at 940, and has the greatest interest in having its law applied to this controversy, *Istim, Inc.,* 78 N.Y.2d at 348, 575 N.Y.S.2d at 798, 581 N.E.2d at 1044.

Brink's, the plaintiff and the intended consignee under the contract of carriage, is a British company with a satellite office in New Canaan, Connecticut. SAA is a South African corporation with a local New York office. SAA, as noted, is also an instrumentality of the South African government. South Africa was the place of contracting[5] and the pri-

5. Brink's seeks to recover as the consignee of the goods which were the subject of the contract of carriage between SAA and Rustenberg, another South African concern. In the absence of any contrary indication, we presume that these two South African concerns formed their contract in South Africa.

mary place of performance.[6] Thus, while the Republic of South Africa is closely associated to the contract of carriage, New York is not associated with that contract at all.

With respect to Brink's' claim of theft, Brink's' theory is that SAA employees stole the goods in South Africa. With respect to Brink's' claim that the wilful misconduct of SAA's employees, under the totality of the circumstances, caused the loss to occur, all of the actions which form the basis of this claim likely occurred in South Africa. In other words, if any misconduct occurred at all, it likely occurred in South Africa. The Republic of South Africa certainly has a greater interest than New York in the alleged wilful misconduct or gross negligence of SAA, an instrumentality of its government, and the SAP.

SAA is the only party on this record with any relationship to New York, and that is only through a local SAA office. The discovery at Kennedy Airport, that several boxes of cargo were missing, is the only contact New York has had with this dispute, and that contact is of limited significance. Thus, New York's nexus with this case is not substantial.

In short, all significant relationships and events point toward South Africa as the sovereign with the greatest interest in having its law applied to this controversy. South African law governing employer-employee liability may be in conflict with New York law. However, New York's nexus with this case is not so substantial that application of South African law would threaten public policy as expressed in New York's common law master-servant rule. Moreover, holding SAA liable for employee theft would not be so "obnoxious" to New York public policy. *Cooney,* 81 N.Y.2d at 79, 595 N.Y.S.2d at 927, 612 N.E.2d at 285. Thus, New York choice of

law doctrine requires application of South African law to this controversy.

### D. *Remand*

In accordance with the foregoing, we conclude that Article 25 of the Warsaw Convention defers to the law of the forum jurisdiction for a determination of what conduct constitutes wilful misconduct by an air carrier. In the United States federal courts, that law is the substantive law of the forum jurisdiction, including the forum's choice of law rules. In this case, New York choice of law rules require application of South African law.

Thus, to the extent that the district court relied on New York master-servant law in granting SAA partial summary judgment, we reverse the judgment of the district court and remand the cause for a determination of liability under South African law. If theft by an employee acting in the course of employment constitutes wilful misconduct by an employer-air carrier under *South African* law, the district court must determine, in accordance with SAA's motion, whether Brink's has set forth sufficient evidence of theft to defeat the motion for summary judgment. Similarly, the district court must determine whether, under *South African* law, Brink's has set forth a colorable claim that the conduct of SAA employees, under the totality of the circumstances, constituted wilful misconduct by SAA. Accordingly, the judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

### II. *The Air Waybill*

The final issue we must decide is whether incorporation by reference satisfies the requirement of Articles 8[7] and

---

6. SAA was responsible for transporting the Rustenberg precious metals from Jan Smuts Airport to John F. Kennedy International Airport without loss or damage. The bulk of SAA's work with respect to the Rustenberg cargo was guarding the cargo before loading, during loading, and after loading until take-off.

7. Article 8 provides, in pertinent part:
 The air waybill shall contain the following particulars:
 . . . .

(c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right the alteration shall not have the effect of depriving the transportation of its international character;
. . . .
(e) The name and address of the first carrier;
. . . .

9 [8] that an air waybill "contain" certain essential information. Warsaw Convention, Arts. 8 & 9. More specifically, we must determine whether an air waybill that incorporates essential particulars by reference to documents outside the waybill and to statements within the waybill satisfies Articles 8 and 9.

The Warsaw Convention addresses three transportation documents and the "particulars" which must be set forth in each document. The three documents are passenger tickets, baggage checks and air waybills. *See* Warsaw Convention, Chap. II, Sec. I (passenger tickets), Chap. II, Sec. II (baggage checks), Chap. II, Sec. III (air waybills). The consequences for violating a "particular" requirement depend upon which transportation document and which "particular" are involved.

With respect to the air waybill, Article 8 of the Convention requires that the waybill "shall contain" seventeen particulars. Warsaw Convention, Art. 8(a)–(q). Of the seventeen particulars, ten are deemed essential—including the "agreed stopping places" and the "name and address of the first carrier." *Id.*, Art. 8(c) & (e), Art. 9. Under Article 9, if the waybill does not "contain" the essential particulars, the carrier may not avail itself of the Convention's limited liability protection. *Id.*, Art. 9.

We examined Article 8 and Article 9 of the Convention in *Exim Indus. v. Pan Am. World Airways*, 754 F.2d 106, 108 (2d Cir. 1985). In that case, the carrier did not include all of the particulars listed in subsections (h) and (i) of Article 8. We first noted that the text of subsections (h) and (i) was ambiguous because it was not clear whether the text should be read to require one or all of the listed items. *Id.*; *see also* n. 7, *supra*. We therefore turned to traditional interpretive techniques and concluded that Article 9 does not deprive a carrier of limited liability where the waybill omits a subsection (h) or

(i) particular unless the omission is of practical commercial significance. *Id.*

Parties to litigation before this Court have argued repeatedly that *Chan*, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113, implicitly overruled *Exim*. Each time, we rejected that argument. *See, e.g., Maritime Ins. Co. Ltd. v. Emery Air Freight Corp.*, 983 F.2d 437, 440 (2d Cir.1993); *Distribuidora Dimsa v. Linea Aerea Del Cobre S.A.*, 976 F.2d 90, 95–96 (2d Cir.1992). In both *Maritime Ins.* and *Distribuidora Dimsa*, we explained that *Exim* did not violate the rule invoked in *Chan*—that a treaty should be interpreted according to its plain language—because *Exim* involved ambiguous language. *Maritime Ins.*, 983 F.2d at 440; *Distribuidora Dimsa*, 976 F.2d at 96.

Although we limited *Exim*'s commercial significance approach to subsections (h) and (i), *Maritime Ins.*, 983 F.2d at 440, we did so only because the remaining subsections of Article 8 did not contain the same conjunctive-disjunctive ambiguity. While our language in so limiting *Exim* concededly was broad, we also distinguished between *omissions* and *deviations* in language and explained that Article 9 offers little guidance with respect to deviations. *Id.* We concluded that Article 9 clearly and unambiguously deprives an air carrier of limited liability if its air waybill *omits* any other essential Article 8 particular. *Id.* However, *Maritime Ins.* does not provide that deviations from the literal language of Article 8 *per se* deprive an air carrier of limited liability under Article 9.

We extract three rules from this pertinent body of case law. First, if an air carrier *omits* any of the enumerated particulars of subsections (h) and (i) of Article 8, Article 9 deprives the carrier of limited liability protection if the omitted particular is of commercial significance. *Exim*, 754 F.2d at

---

(h) The number of packages, the method of packing, and the particular marks or numbers upon them;
(i) The weight, the quantity, the volume, or dimensions of the goods.
Warsaw Convention, Art. 8.

**8.** Article 9 provides:

If the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8(a) to (i), inclusive, and (q), the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability.
Warsaw Convention, Art. 9.

108. Second, if an air carrier omits any other essential particular from its air waybill, Article 9 deprives the air carrier of limited liability protection regardless of commercial significance. *Maritime Ins.*, 983 F.2d at 440. Third, if an air waybill includes an essential particular, but deviates in language or some other respect, the question of whether or not Article 9 deprives the air carrier of limited liability may be determined with the assistance of traditional methods of interpretation. *Id.*

In short, the operation of Articles 8 and 9 is relatively clear with respect to *pure omissions*. However, the text of Articles 8 and 9, when considered separately or together, offers little guidance as to the manner in which an air carrier must include the particulars in the air waybill. In other words, Article 9 does not address the consequences of less than strict compliance with, but more than pure omission of, the requirements of Article 8.

Thus, beyond the context of pure omissions, we may consider sources outside of the text to determine whether a particular air waybill satisfies Article 8. Proper sources include the drafting history of the Convention and of the specific provisions in question, the decisions of other courts interpreting the provisions in question, particularly those of sister signatories to the Convention, and other rules of construction. *See, e.g., id.* (stating that "when language is unclear, courts are enjoined to construe treaties more liberally than private agreements"). After considering these sources, we must determine whether the manner of compliance, or the information provided, satisfies the purpose of requiring the specified particular to be included in the waybill.

The dispute in this case centers around subsections (c) and (e) of Article 8. These provisions require an air carrier to include "[t]he agreed stopping places" and "[t]he name and address of the first carrier" within the air waybill. Warsaw Convention, Art. 8(c) & (e).

The SAA–Rustenberg air waybill did not identify Ilha Do Sal as an agreed stopping place in the space provided for routing information. Rather, on the back of the waybill,

it included a statement that the agreed stopping places were those shown in the carrier's timetables. *See* n. 3, *supra.* With respect to the address of the first carrier, in this case SAA, the reverse side of the waybill contained a statement that "[t]he first Carrier's address is the airport of departure shown on the face" of the waybill. The front of the waybill identified JSA (Jan Smuts Airport) as the airport of departure.

Our task with Article 8(c) requires us to look beyond the plain language of that provision. Because the air waybill does not specifically list the agreed stopping places, we must determine whether reference to an air carrier's timetables satisfies Article 8(c)'s requirement that the waybill "contain" the information. In making this determination, we turn to sources outside of the text itself.

The question posed is one of first impression in this Court, and we have found no other decisions of our sister circuits on point. However, courts of other Warsaw signatory nations have approved of satisfying Article 8(c) by incorporating timetables into the air waybill. *See, e.g., Corocraft Ltd. v. Pan Am. World Airways,* [1969] 1 Q.B. 616, 628 (Q.B.D.1968), *rev'd on other grounds,* [1969] 1 Q.B. 648 (Eng.C.A.1968) (approving of incorporation of timetables in satisfaction of Article 8(c)).

Lower federal courts and state courts within the United States also have concluded, uniformly, that incorporation by reference to readily available timetables satisfies Article 8(c). *See, e.g., Tai Ping Ins. Co. Ltd. v. Northwest Airlines,* 897 F.Supp. 127, 130 (S.D.N.Y.1995); *Kraus v. KLM,* 92 N.Y.S.2d 315, 317 (Sup.Ct.1949), *aff'd,* 278 A.D. 811, 105 N.Y.S.2d 351 (1st Dep't 1951). The district court adopted this rule.

■ The purpose of Article 8(c) was to notify shippers of the international character of the transportation and the applicability of the Warsaw Convention. Minutes, Second International Conference on Private International Law, October 4–12, 1929, Warsaw 248–49 (R.C. Horner & D. Legrez trans. 1975) (containing *Report of the International Technical Committee of Aeronautical Legal Experts on the Preliminary Draft of a Conven-*

tion relating to documents of air carriage by aircraft ("The particulars *indicating that a document covering international carriage is involved*, that is to say, those provided for under letters (a) through (f), are indispensable." (emphasis added))) [hereinafter "Horner & Legrez"]; K.M. Beaumont, *Need for Revision and Amplification of the Warsaw Convention*, 16 J. of Air L. & Com. 395, 398 (1949); *Tai Ping*, 897 F.Supp. at 130; *American Smelting & Ref. Co. v. Philippine Air-Lines*, 4 Av. Cas. (CCH) 17,413, 17,414 (N.Y.Sup.Ct.1954), *aff'd mem.*, 285 A.D. 1119, 141 N.Y.S.2d 818 (1st Dep't 1955), *aff'd mem.*, 1 N.Y.2d 866, 153 N.Y.S.2d 900, 136 N.E.2d 14 (1956); *Kraus*, 92 N.Y.S.2d at 317; *see also* Dr. Daniel Goedhuis, Nat'l Airlegislations and the Warsaw Convention 148–50 (1937) (referring to passenger tickets). While the point of departure and destination ordinarily would indicate the domestic or international character of the flight, Article 8(c) recognizes the possibility of carriage within one sovereign with a stopover in another sovereign. *See* Horner & Legrez, *supra*, at 247 ("The definition of international carriage was formulated in a broad sense, so that carriage whose point of departure and point of destination are situated in the same State is, nonetheless, considered as international when a stop is contemplated in another State."); Goedhius, *supra*, at 148–50 ("[T]he carriage between Marseilles and Dakar is internal carriage and ... carriage between Marseilles and Dakar with a stop at Barcelona is international within the meaning of the Warsaw Convention."); Beaumont, *supra*, at 398 ("The object of inserting at least one agreed stopping place is important when carriage between two territories of the same State is involved because, unless there is an *agreed* stopping place in another State, the carriage would not be 'international.' ").

Although Brink's concedes that Article 8(c) was intended to notify shippers of the international character of the flight, Brink's contends that Article 8(c) also was intended to warn shippers of stops where their goods might be placed at risk. Brink's refers to minutes of the Convention, which demonstrate that some participants were concerned about possible seizures of goods at intermediate stops and therefore desired that Article

8(c) also require inclusion of the route to be followed within the waybill. We note, however, that the participants ultimately declined to include a requirement within subsection (c) that the waybill contain the route to be followed. *See* Horner & Legrez, *supra*, at 158–59. Instead, they included such a requirement within subsection (p), which they adopted as an optional particular. *See* Warsaw Convention, Art. 8(p) & Art. 9. Thus, as far as this record reveals, the purpose of subsection (c) was to provide notice of the international character of the flight.

 We believe that incorporation by reference satisfies Article 8(c). An air waybill that refers the shipper to readily available timetables provides sufficient information to notify the shipper of the agreed stopping places, and therefore, of the international or non-international character of the flight. More specifically, the SAA–Rustenberg air waybill, which referred Rustenberg to its published timetables for information regarding stopovers, provided Rustenberg with sufficient information to ascertain the regularly scheduled stopover in the Cape Verde Islands. Thus, the SAA–Rustenberg air waybill satisfies the requirements of Article 8(c), and Article 9 does not operate to deprive SAA of limited liability protection. In this respect, we affirm the judgment of the district court.

 Our task with Article 8(e) is an easy one. We need examine only the text of Article 8(e) and the waybill itself to conclude that the waybill "contains" the name and address of the first carrier as required by Article 8(e). Warsaw Convention, Art. 8(e). The reverse side of the waybill unmistakably identifies the airport of departure, shown on the face of the waybill, as the address of the first carrier. The face of the waybill identifies JSA (Jan Smuts Airport) as the airport of departure. Article 8(e) does not designate any particular section of a waybill or any particular words which must be used to relay the required information. An air waybill that identifies the airport of departure as the address of the first carrier *within the air waybill itself* is sufficient to relay the required information. Thus, the SAA–Rusten-

berg air waybill satisfies the requirements of Article 8(e), and Article 9 does not operate to deprive SAA of limited liability protection.

The parties apparently did not refer the district court to the language identifying the airport of departure as the address of the first carrier. At least the district court did not mention this language in its opinion, in which it concluded that the waybill did not contain the address. Nevertheless, the district court concluded that this oversight would not deprive SAA of limited liability protection because SAA's address is readily available. Although the district court erred, the error was harmless because the district court reached the proper conclusion as to liability. Thus, in this respect also, we affirm the judgment of the district court.

In short, we conclude that the SAA–Rustenberg air waybill satisfies the requirements of both Article 8(c) and 8(e) and that Article 9 does not deprive SAA of limited liability protection. Our conclusion is consistent with the rule of interpreting ambiguous treaty provisions liberally, as well as with the decisions of both domestic and foreign courts and, thus, fosters the goal of uniformity advanced by the Warsaw Convention.

## CONCLUSION

To the extent that the district court granted partial summary judgment to SAA on the basis of New York law regarding employer-employee liability, the judgment is reversed and the cause remanded for further proceedings consistent with this opinion. To the extent that the district court granted partial summary judgment to SAA on the basis that the air waybill satisfied the requirements of Article 8 of the Warsaw Convention, the judgment is affirmed.