**BRINK'S LIMITED, Plaintiff–Appellant,**

v.

**SOUTH AFRICAN AIRWAYS,
Defendant–Appellee.**

No. 97–7948.

United States Court of Appeals,
Second Circuit.

Argued April 15, 1998.

Decided July 2, 1998.

Craig S. English, Kennedy, Lillis, Schmidt & English, New York City, for Plaintiff–Appellant.

Franklin F. Bass, Rosenman & Colin LLP, New York City (Andrew J. Harakas, Christian C. Gillis, of counsel), for Defendant–Appellee.

Before: KEARSE and MINER, Circuit Judges, and AMON, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Brink's Limited ("Brink's") appeals from a final judgment in its favor in the amount of $1,520 entered in the United States District Court for the Southern District of New York (Baer, J.) following a bench trial. The judgment reflects the district court's determination that defendant South African Airways ("SAA") was entitled to a limitation of its liability under the provisions of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, *reprinted in* 49 U.S.C.A. § 40105 note (the "Warsaw Convention" or the "Convention"). Article 25 of the Warsaw Convention eliminates Article 22's limitation on liability in cases where either the carrier, or its agents acting within the scope of their employment, have engaged in wilful misconduct. We agree with the district court's formulation of the standard for wilful misconduct and with the district court's view that Brink's has not proven wilful misconduct by a preponderance of the evidence.

## BACKGROUND

The factual background of this litigation is set forth in detail in *Brink's Ltd. v. South African Airways*, 93 F.3d 1022 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997)(*"Brink's II "*), familiarity with which is assumed. We highlight here only those facts most pertinent to this appeal.

Rustenberg Platinum Mines, Ltd. ("Rustenberg") contracted with SAA to transport thirty-four boxes of rhodium and palladium, both platinum metals, from Johannesburg, South Africa to New York City. Rustenberg contracted with Brink's to provide security for the shipment and to indemnify it from any losses. When the container that was supposed to contain the thirty-four boxes was opened at a cargo warehouse at John F. Kennedy International Airport ("JFK Airport") in New York City, six boxes were found to be missing. The missing metals, alleged to be worth $1,789,012.67, disappeared at some point after being delivered to Jan Smuts Airport in Johannesburg. Brink's paid Rustenberg $1,777,624 in satisfaction of its indemnification obligation. As consignee under the SAA–Rustenberg air waybill, Brink's commenced against SAA the action giving rise to this appeal, contending that the six boxes were stolen while in SAA's custody. *See Brink's II*, 93 F.3d at 1025. Brink's seeks to recover the amount it has paid Rustenberg for the loss.

■ It is undisputed that this action is governed by the provisions of the Warsaw Convention. The air waybill provided for international transportation of the cargo by air within the meaning of Article 1 of the Convention. *See* Warsaw Convention, art. 1; *Brink's II*, 93 F.3d at 1026–27. Pursuant to Article 22(2) of the Convention, the liability of SAA for lost cargo is limited to 250 francs per kilogram, which has been set at approximately $9.07 per pound. *See* 39 Fed.Reg. 1526 (1974) (setting $9.07 per pound of cargo as "the minimum acceptable figure[ ] in United States dollars for liability limits applicable to 'international transportation' and 'international carriage' "); 14 C.F.R. § 221.176 (1998). However, under Article 25(1) and (2), the Convention eliminates the limitation of liability where the wilful misconduct of the carrier or its agent causes the loss or damage.[1] Under these provisions, a complainant must prove both wilful misconduct and proximate cause in order to avoid the general rule of limited liability. *See Republic Nat'l Bank*

---

* The Honorable Carol Bagley Amon, of the United States District Court for the Eastern District of New York, sitting by designation.

1. Article 25 of the Warsaw Convention states:
    (1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be wilful misconduct.
    (2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.

*v. Eastern Airlines, Inc.,* 815 F.2d 232, 238–40 (2d Cir.1987).

By Memorandum and Order dated April 4, 1995, the district court granted SAA's motion for partial summary judgment and limited SAA's liability to $1,520 pursuant to the per kilogram formula of Article 22. *See Brink's Ltd. v. South African Airways,* No. 94 Civ. 1902, 1995 WL 225602 (S.D.N.Y. Apr. 17, 1995)(*"Brink's I"*). Brink's appealed. On appeal, we affirmed in part and reversed in part. *See Brink's II,* 93 F.3d at 1026–36. In reversing, we concluded, *inter alia,* that (1) the district court had erred by applying New York substantive law on the issue of whether SAA's employees had engaged in wilful misconduct; and (2) under New York choice of law rules, South African law should have been applied. *See id.* at 1028, 1032. Accordingly, we remanded the case to the district court for a determination of liability under South African law. *See id.* at 1032. We also affirmed the partial summary judgment in favor of SAA only to the extent that the district court determined that the air waybill satisfied Warsaw Convention requirements for the limitation of liability. *See Brink's II,* 93 F.3d at 1032–36.

The district court conducted a two-day bench trial in January of 1997. The following facts were undisputed. On the morning of September 10, 1992, Rustenberg loaded the shipment of precious metals into one of its armored cars. At approximately 1:10 p.m., the armored car arrived at the high value cargo vault within the SAA cargo facility at Jan Smuts Airport. An SAA employee, under the supervision of the armored car driver as well as certain officers in the South African Police Department (the "SAPD"), off-loaded sixty-five boxes from the armored car. These boxes were marked with air waybill labels and loaded into two separate containers. Thirty-two boxes of palladium and two boxes of rhodium were placed into a metal container denominated "AVE 1617." These thirty-four boxes were headed for New York. The remaining thirty-one boxes of precious metals were placed in a canvas front container and were bound for London.

After the New York-bound boxes were loaded into container AVE 1617, padlocks and plastic seals were affixed to the container's two latches. The two plastic seals were used because the latches on the container could be opened even with the padlocks securely in place. Once the seals were used, the latches could not be opened without breaking the seals. The container thereafter was rolled back into the high value cargo vault to await departure that evening on Flight 201 to New York. The vault was then closed and locked both by SAPD officers and SAA personnel. The vault was reopened at approximately 6:11 p.m. Container AVE 1617 was removed and escorted by the police officers to the New York-bound aircraft, onto which it was loaded.

SAA Flight 201 departed at 8:08 p.m., making its regularly scheduled stop at Ilha do Sal in the Cape Verde Islands. The flight arrived at JFK Airport at about 6:30 a.m., one hour ahead of schedule. The Brink's vehicle that was expected to meet Flight 201 did not arrive until approximately 7:30 a.m., despite the fact that company policy required that it be waiting one hour prior to the scheduled arrival of the flight. Shortly after landing at JFK Airport, the SAPD courier accompanying the shipment, General Louwrens Malan, handed the keys to container AVE 1617 to SAA security officer Thomas Curr. Thereafter, the container was moved to the British Airways cargo warehouse on a cart. Curr, Thomas Duffy of Ogden Aviation Services, the company that loaded and unloaded SAA cargo at JFK Airport, officers of the Port Authority Police Department and the Brink's vehicle escorted the cart to the warehouse. In the presence of a British Airways supervisor, representatives from Brink's and Curr, the container was opened. It was then that six of the 34 boxes, five containing palladium and one containing rhodium, were found to be missing. The gross weight of the six boxes was 76.14839 kilograms, or 167.86 pounds.

The evidence at trial consisted of live testimony of seven witnesses, two videotaped depositions and excerpts from eleven transcribed depositions. Brink's presented the live testimony of (1) Willem Johannes Engelbrecht, the sergeant in the SAPD who was in charge of police security for high value cargo

at the time of the theft; (2) Wynne Berry, the chief of security for the London operations of Brink's; and (3) Denis Phipps, an expert on the subject of airport security.

Sergeant Engelbrecht testified that the SAPD and SAA had separate keys and combination codes, both of which were necessary to open the high value cargo vault where the shipment was being stored between arrival at Jan Smuts Airport and loading onto Flight 201. Berry speculated that the six boxes were stolen from the belly of the aircraft either at Jan Smuts Airport or at JFK Airport by relocating the boxes into another container in the aircraft. Berry conceded that a thief operating at JFK Airport need not have been an employee of SAA and confirmed that the Brink's truck should have been at JFK Airport to meet the flight, despite the fact that the flight arrived ahead of schedule. Phipps opined that one of the two SAA loaders in Johannesburg was responsible for the theft, but conceded that theft by a third-party is "a possibility that can't be excluded." Phipps admitted that he did not know what had happened to the missing six boxes.

SAA presented the live testimony of (1) Jose Rheeder, an SAA cargo loader who loaded the flight's cargo; (2) Richard Capkey, an SAA cargo trainee who assisted Rheeder; (3) Hendrik Jacobus van Rensburg, a major in the SAPD who investigated the theft; (4) John T. Finning, an expert on aviation security; and the deposition testimony of (5) General Malan, the SAPD courier who accompanied the shipment from Johannesburg to New York; and (6) Constable Alex Ramoroka, the SAPD officer who guarded the shipment during the loading of Flight 201.

Rheeder explained that Capkey was present while the aircraft was being loaded and that Capkey observed and assisted where possible. Additionally, loading was supervised by one of SAA's senior supervisors. Rheeder's testimony was unequivocal—no one could have removed anything from the holds on SAA's aircraft where the high value cargo had been loaded prior to the flight's departure. Although Rheeder took a break, an armed SAPD officer remained present and the FMC, a machine which provided the only means of off-loading cargo from the aircraft, had been placed in the down position. Rheeder denied any involvement in the theft. He was investigated by the SAPD, and his home and bank accounts were searched. However, he was neither disciplined by SAA nor prosecuted. Capkey testified that Flight 201 was the first flight on which he had worked with Rheeder. Additionally, he noted that he had worked at the aircraft until its departure and that he never saw anyone remove any boxes or containers from the high value cargo hold, and he insisted that he did not have anything to do with the theft.

Major van Rensburg testified regarding his investigation of the theft of the six boxes. He explained that the investigation was closed after thirteen months, that the case remains unsolved and that there are no suspects. He noted that paid informants had been employed in connection with the investigation and that the only two refineries in South Africa that could utilize the rhodium and palladium were both notified about the theft, but neither had come across the metals. Major van Rensburg opined that the theft had not occurred in South Africa.

Finning testified that the security procedures implemented by SAA exceeded those of most airlines and added that the shipping containers used by SAA on Flight 201 were adequate. He explained that a container is a shipping device rather than a security device. He stated that a container is not intended to provide security; rather "high value [cargo] procedures, the armed escort and the hand-to-hand confinement, that is [a] security procedure."

General Malan testified that in Ilha do Sal, except for a three-minute interval when he used the bathroom facilities at the airport, he continuously observed the hatch to the hold that contained the shipment, and he was certain that the hatch had not been opened. Constable Ramoroka, who guarded the shipment prior to take-off, testified that he could see the container even after it had been loaded onto the aircraft and that during this period the container was not tampered with in any way. In sum, none of the witnesses

provided any particularly helpful evidence as to when, how, or from where the six boxes of platinum metals disappeared.

In a posttrial Opinion and Order dated June 10, 1997, the court ruled that Brink's had failed to prove by a preponderance of the evidence that either SAA, or its agents, was guilty of wilful misconduct and, accordingly, that the cap on damages of $1,520 was applicable. *See Brinks Ltd. v. South African Airways,* No. 94 Civ. 1902, 1997 WL 323921, at *7 (S.D.N.Y. June 13, 1997)("*Brink's III* "). The court reasoned:

> While the precious metal was obviously stolen, there is insufficient proof to show when or how that theft occurred or any fault. The police appear to share that view and have closed the case with no suspects. Plaintiff has not identified, much less proven, who stole the cargo. Absent any such evidence, it is impossible to find that defendant or its agents engaged in wilful misconduct . . .

*Id.* The district court entered judgment in favor of the defendant on July 15, 1997. This appeal followed.

## DISCUSSION

The sole issue on appeal is whether the district court erred in concluding that neither SAA nor its agents were engaged in "wilful misconduct" under the laws of the Republic of South Africa.

■ We have held that, in a non-jury case, a district court's conclusion whether a carrier has engaged in "wilful misconduct," within the meaning of the Warsaw Convention, is a mixed question of law and fact. *See Perera Co. v. Varig Brazilian Airlines, Inc.,* 775 F.2d 21, 23 (2d Cir.1985); *accord Koirala v. Thai Airways Int'l, Ltd.,* 126 F.3d 1205, 1210 (9th Cir.1997). The district court's conclusion in regard to the existence *vel non* of wilful misconduct is entitled to great weight. *See Perera Co.,* 775 F.2d at 23; *accord Koirala,* 126 F.3d at 1210 (with respect to wilful misconduct "[a]ssessment of state of mind is . . . better suited for district court examination. . . . District courts are inherently better positioned to make such judgments because of their superior vantage point to the

evidence."). With respect only to the district court's findings of fact, we may not set aside those findings unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "[A] finding is clearly erroneous when . . . the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted). Finally, we review *de novo* the district court's determinations on questions of foreign law. *See Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,* 29 F.3d 79, 81 (2d Cir.1994).

■ We review first the legal definition of "wilful misconduct" adopted by the district court. The district court determined that there were no cases decided by the courts of South Africa addressing the issue of what constitutes wilful misconduct in a Warsaw Convention case. Like the district court, we also have been unable to uncover any South African cases that address the relevant legal standard. Accordingly, we agree with the district court that the proper standard should be informed by British case law. *See generally* J.R. du Plessis & L. Kok, *An Elementary Introduction to the Study of South African Law* 28 (1989)("Some rules of foreign law and decisions of foreign courts may constitute very strong persuasive authority indeed. Thus, for instance, [South African] company law is largely derived from English law and decisions of the courts of England on company law may in given circumstances be very persuasive, if not virtually binding, authority in [South African] courts."); *see also* Joint Pre–Trial Order at 7 (reflecting agreement among the parties that where "[t]here is no relevant South African precedent defining wilful misconduct in the context of a Warsaw Convention case, . . . South African courts would normally look to . . . Warsaw Convention cases from England, as well as Australia, Canada and the United States").

■ The district court relied on the English case of *Rustenberg Platinum Mines Ltd. v. South African Airways* to set forth a standard for wilful misconduct:

> It is common ground that 'wilful misconduct' goes far beyond any negligence, even

gross or culpable negligence, and involves a person doing or omitting to do that which is not only negligent but which he knows and appreciates is wrong, and is done or omitted regardless of the consequences, not caring what the result of his carelessness may be.

[1977] 1 Lloyd's Rep. 564, 569 (Q.B.), *appeal dismissed*, [1979] 1 Lloyd's Rep. 19 (C.A.). The district court also cited another English case, *Horabin v. British Overseas Airways Corp.*, which further clarifies the subjective intent requirement:

To be guilty of wilful misconduct the person concerned must appreciate that he is acting wrongfully, or is wrongfully omitting to act, and yet persists in so acting or omitting to act regardless of the consequences, or acts or omits to act with reckless indifference as to what the results may be.

[1952] 2 All E.R. 1016, 1022 (Q.B.). Accordingly, the British courts (1) have devised a standard for determining whether a carrier or its agents have engaged in wilful misconduct within the meaning of the Warsaw Convention; and (2) require both a showing beyond what is required in order to prove negligence or gross negligence and a demonstration of subjective intent.

■ In addition to agreeing with the district court's formulation of the standard for wilful misconduct under South African law, we agree with the district court's view that the evidence presented does not support a finding of wilful misconduct. Brink's never showed when or how the theft occurred, much less that an employee or other agent of SAA had knowingly acted wrongfully or knowingly failed to act to prevent the theft. On appeal, Brink's argues principally that the district court improperly elevated the plaintiff's burden of proof in the present case.

Specifically, Brink's contends that it need not "prove that a particular employee/agent had complicity in the theft in order to attribute the theft to SAA. The burden can be satisfied by showing that the theft was committed by one or more persons for whom SAA is responsible, even if the thieves cannot be precisely identified." Assuming, *arguen-*

*do,* that Brink's is correct in this proposition, the case still was properly decided. After reviewing all of the evidence, the district court concluded that Brink's had not proven by a preponderance of the evidence that the theft had been committed by any agent of SAA. The court specifically noted that there were no suspects and that the police in South Africa had no leads. In other words, any conclusions as to the identity of the perpetrators or their *modus operandi* would be purely speculative. Accordingly, we agree with the district court's view that the plaintiff failed to sustain its burden of proof.

Brink's further argues that the district court improperly assumed that "the six boxes of platinum-based metals could not have been stolen during loading operations unless the boxes were removed from the plane." Brink's contends that it "is more likely on the evidentiary record that the stolen boxes were secreted in another container inside the cargo hold or in the hold, and not removed from the hold during loading." Presumably, the plaintiff believes that one or both of the SAA loaders in Johannesburg may have hidden the six boxes and that they were removed by an accomplice at some point thereafter. This contention amounts to little more than conjecture and is an insufficient basis on which to reverse the district court's determination.

The absence of any compelling evidence precludes a determination in this case that either SAA, or its agents, was engaged in wilful misconduct. This is so even if the SAPD officers are considered agents of SAA. We therefore find it unnecessary to review that portion of the district court's decision that further defines an "agent of the carrier acting within the scope of his employment," and excludes the members of the SAPD from the definition. *See Brinks III*, 1997 WL 323921 at *6.

## CONCLUSION

We have considered all of plaintiff's arguments on this appeal and, for the reasons discussed above, have found in them no basis

for reversal. The judgment of the district court is affirmed.