**ROYAL INSURANCE a/s/o IBM World Trade Corporation and Semi-Alloys, Inc., Plaintiffs,**

v.

**AMERFORD AIR CARGO a/k/a Amerford International Corp., Defendant.**

**No. 85 Civ. 3887 (JMC).**

United States District Court, S.D. New York.

March 6, 1987.

Alexander Lesyk, Vincent, Berg & Russo, New York City, for plaintiffs.

Vincent M. DeOrchis, Diane M. Rollo, DeOrchis & Partners, New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Fed.R.Civ.P. 56(a), (b).

## BACKGROUND

Defendant Amerford Air Cargo ["Amerford"] is an air freight forwarder. Its business consists of picking up goods from its customers, arranging air transport on a direct air carrier, consolidating the goods in preparation for transport, and delivering them to the air carrier. For this service, Amerford's customers pay a single fee, which includes the cost of the flight.

IBM World Trade Corporation and Semi-Alloys, Inc. ["IBM"] conducted business with Amerford on a regular basis. On November 2, 1984, IBM contracted with Amerford to deliver three cartons of goods to a Hong Kong consignee. An Amerford truck picked up the cartons from one of IBM's Westchester County facilities at 6:10 p.m. that evening. Amerford had already arranged for the goods to be shipped on a Japan Air Lines flight scheduled to depart the next morning. The goods, semi-alloy products having an actual value of $97,-713.97, were stored overnight in Amerford's warehouse facility located near JFK International Airport. The next morning, Amerford employees preparing for the Japan Air Lines flight could not locate the cartons. Amerford contacted the New York City Police and the F.B.I., but their investigation yielded no direct evidence of theft.

In early December, IBM submitted to Amerford a claim for the full value of the goods. Amerford responded that its contractual liability was limited to $20.00 per kilo, or a total of $1,310.00, because IBM had not declared a higher value for the goods and paid the additional insurance fee. On January 8, 1985, IBM submitted an amended claim to Amerford for $1,310.00. On January 16, IBM's insurer, plaintiff Royal Insurance Co. ["Royal"] paid IBM's claim in full, and on January 22, it was subrogated to all of IBM's rights. On May 22, Royal commenced this action seeking the full value of the goods.

Amerford was not served with the summons and complaint until June 22. In the meantime, on June 7, Amerford sent IBM a check for $1,310.00 in settlement of its

January 8 amended claim. On July 7, IBM returned the check to Amerford, stating that settlement of the claim was in subrogation. Both parties move for summary judgment.

## DISCUSSION

■ The central issue in this case is whether Amerford is an "air carrier" within the meaning of the Warsaw Convention for the Unification of Certain Rules Relating to International Carriage By Air, 49 U.S.C. § 1502 note ["Convention"], thus entitling it to claim the limitation of liability protection found therein. If the Convention applies to Amerford, its liability will be limited to $1,310.00. If the Convention does not apply, Amerford may be liable for the full amount of Royal's claim.

### Amerford's Status Under the Convention

Royal's first argument is that, because the loss took place while the goods were being stored in Amerford's JFK warehouse, Amerford should be deemed a warehouseman rather than an air carrier, and the extent of liability should be determined pursuant to the New York law relating to warehousemen.

Under New York law, a "warehouse unable to return bailed property either because it has lost the property as a result of its negligence or because it has converted the property will be liable for the full value of the goods at the time of the loss or conversion." *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 662, 431 N.Y.S.2d 372, 376, 409 N.E.2d 849 (1980). A warehouseman may contractually limit his liability in the case of negligence, but in the case of conversion, "strong policy considerations bar enforcement of any such limitation." *Id.* at 663, 431 N.Y.S.2d at 376. In *I.C.C. Metals,* the New York Court of Appeals held that when a plaintiff offers uncontroverted proof of delivery to a warehouseman and subsequent proof that the goods were lost or not delivered upon demand, and the warehouse does "not come forward with adequate evidentiary proof in admissible form to support its suggested explanation" for the loss, conversion shall be presumed and the limitation of liability agreed upon shall not be enforceable. *Id.* at 668, 431 N.Y.S.2d at 379.

Amerford's proffered explanation is that the cartons must have been stolen by sophisticated thieves who knew exactly what they wanted, took nothing else and left no traces. However, mere speculation that theft must have been the cause of the loss, without more, is not sufficient to overcome the presumption. *Id.* at 664 n. 3, 431 N.Y.S.2d at 377 n. 3. In light of Amerford's warehousing of the goods and its suggested explanation for the loss, Royal seeks that the presumption of conversion be imputed to Amerford, making it liable for the full value of the goods.

The policy underlying the application of a presumption of conversion to a warehouseman who offers no explanation for the loss of goods placed with him is a sound one. However, the Court does not believe that Amerford can or should be viewed as a warehouseman solely because it stores goods temporarily in a warehouse facility prior to air transport. Without question, customers engage Amerford to ship goods by air, and any storage of such goods prior to flight is temporary and incidental to Amerford's main business purpose. In contrast, a warehouseman "is a person engaged in the business of storing goods for hire." N.Y.U.C.C. § 7–102(1)(h) (McKinney 1964).

Amerford is and holds itself out to the public as an air freight forwarder or indirect air carrier. Federal regulations define an air freight forwarder to mean an indirect air carrier, itself defined as "any citizen of the United States, who undertakes indirectly to engage in air transportation of property only, and who (1) does not engage directly in the operation of aircraft in air transportation, and (2) does not engage in air transportation pursuant to any [Civil Aeronautics] Board order which has been issued for the purpose of authorizing air express service under a contract with a direct air carrier." 14 C.F.R. § 296.1(e).

The difference between direct and indirect air carriers has been defined as follows:

> direct air carriers are those who operate aircraft, while indirect air carriers hold out a transportation service to the public under which they utilize the services of a direct carrier for the actual transportation by air; i.e. those persons who procure shipments from shippers, assemble them, and tender the consolidated lot gathered from the various shippers to a direct air carrier for transportation at a bulk rate which is lower than the rates collected by the forwarders from the shippers. Although they carry no merchandise themselves, the forwarders assume the responsibility of a carrier, but ship by air in direct carrier's planes. Upon arrival of the shipment at the airport of destination, the forwarder divides the bulk shipment and distributes the separate portions to the individual consignees.

*DHL Corp. v. Civil Aeronautics Board,* 584 F.2d 914, 915 (9th Cir.1978).

Factors to be considered "in determining whether a party acted only as a forwarder or as a forwarder-carrier include ... the way the party's obligation is expressed in documents pertaining to the agreement, ... [and] the history of dealings between the parties." *Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. 268, 273 (S.D.N.Y. 1980) (citations omitted). Another significant factor is

> how the party made its profit, in particular, ... whether the party "picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination ... [charging] a rate covering the entire transportation and [making] its profit by consolidating the shipment with others" ... [,] while the shipper "seldom if ever knew which carrier would be utilized in the carriage of his shipment"....

*Id.* (citations omitted).

All of these factors support the conclusion that Amerford is an indirect air carrier. First, when Amerford picked up the cartons, it issued an airway bill to IBM, which stated:

> Hereunder the sole responsibility of the Company is as *indirect carrier,* subject to its filed tariff or as agent for the direct carrier after issuance of direct carrier's airway bill.... "Carrier" includes the carrier or forwarder issuing this airway bill and all carriers that carry the goods hereunder or perform any other services related to such air carriage. For the purposes of the exemption from the limitation of liability provisions set forth as referred to herein, "Carrier" includes agents, servants, or representatives of any such air carrier.

Affidavit of Donald F. Greene, Amerford Claims Manager, Ex. B (filed S.D.N.Y. Feb. 25, 1986). Second, Amerford and IBM had conducted business over an extended period of time and IBM was familiar with Amerford's business practices. IBM even maintained blank airway bills at its location. Third, IBM always contracted with Amerford to handle the entire transaction, i.e., pick-up from its facility, temporary storage of the goods pending transport, and arrangement for their shipment via a direct air carrier. IBM paid one fee for these services, and it included the price of air transport on the direct carrier.

It is fairly well established in this Circuit that the agent of an air carrier may claim the limitation of liability provisions found in the Convention. *See Baker v. Lansdell Protective Agency, Inc.,* 590 F.Supp. 165, 170–71 (S.D.N.Y.1984); *Reed v. Wiser,* 555 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977) (Convention's limitation of liability applies to employees of air carrier); *Julius Young Jewelry Mfg. Co. v. Delta Air Lines,* 67 A.D.2d 148, 151, 414 N.Y.S.2d 528, 530 (1st Dep't 1979) ("To allow an agent ..., which is performing services in furtherance of the contract of carriage, and in place of the carriers themselves, to be liable without limit would circumvent the Convention's purposes of providing uniform worldwide liability rules and definite limits to the carriers' obligations."). Thus,

it seems clear that had IBM contracted with Japan Air Lines as a direct carrier and the latter had contracted with Amerford to act as its agent for the purpose of picking up the goods, storing them until a flight was available, and delivering them to the aircraft itself, Amerford would be entitled to claim the benefits of the Convention's limitation of liability provision. There is no logical reason to deny Amerford resort to the Convention solely because it does not undertake the functions of air carriage directly, especially as the Convention does not differentiate between direct and indirect carriers, or otherwise define air carrier. Accordingly, Amerford, as an indirect carrier, is entitled to claim the limitation of liability found in the Convention.

*Limitation of Liability*

The Warsaw Convention creates a presumption of liability. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 247, 104 S.Ct. 1776, 1780, 80 L.Ed.2d 273 (1984). Article 18 of the Convention provides:

(1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

(2) The transportation by air within the meaning of the preceding paragraph *shall comprise the period during which the baggage or goods are in [the] charge of the carrier, whether in an airport or on board an aircraft*, or, in the case of a landing outside an airport, in any place whatsoever.

49 U.S.C. § 1502 note (emphasis added). By its terms, the Convention applied to Amerford from the time it took possession of IBM's cartons.

Article 22 limits the liability of air carriers for lost goods to the equivalent of $20.00 per kilo, or $9.07 per pound, "unless the consignor [IBM] has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum

if the case so requires." 49 U.S.C. § 1502 note. Royal's second argument is that, even if the Convention applies to Amerford as an indirect carrier, it is not entitled to a limitation of liability because of Article 25(1), which provides:

The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

■ Royal argues that Amerford's failure to explain the loss of the goods while stored in its warehouse comes within the *I.C.C. Metals* holding and should, therefore, result in a presumption of conversion, or the "equivalent" of wilful misconduct. Royal cites the case of *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313 (2d Cir.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). In that case, plaintiff delivered goods to defendant shipping company, which provided for their storage at its New Jersey port facility prior to their being loaded aboard a vessel for transport. Part of the shipment never arrived, and the carrier had no explanation for the loss. Instead, it claimed that its liability was limited by the terms of the Carriage of Goods By Sea Act, 46 U.S.C. § 1304(5) ["COGSA"]. The limitation of liability had been contractually extended by the parties to cover that period of time when the goods were to be stored at the port facility prior to departure. The district court granted defendant's motion for summary judgment, thus limiting its liability to the amount agreed upon.

The Court of Appeals reversed, holding that, by its terms COGSA applied only to the time the goods were actually loaded on the vessel and until unloaded at the final destination. The Court further held that although parties could contractually extend COGSA's limitation of liability terms to the period prior to loading, state law governed such an agreement. Then the Court found

that the defendant had acted as a warehouseman during the time the goods were being stored. Applying New Jersey law, which was similar to the New York rule espoused in *I.C.C. Metals Corp.*, the Court imputed to defendant a presumption of conversion as it had offered no substantial explanation for the loss of the goods. Because the defendant had offered no evidence to rebut the presumption of conversion, the limitation of liability, although contractually agreed upon, was not available. The Court then granted judgment for the plaintiff in the full amount of the goods.

*Colgate* can be sufficiently distinguished from the instant case to warrant rejection of Royal's argument based on it. First, by its terms, COGSA applies *only* to the time when goods are actually on board a sea vessel. Thus, in *Colgate* state law had to be applied to the time period prior to loading when the goods were being stored at the port facility. In contrast here, the Convention's terms expressly apply from the time goods come under the charge and control of the air carrier. *See* Art. 18(2), 49 U.S.C. § 1502 note. Thus, the limitation of liability attaches from that point onward as a result of the Convention itself, not any contractually agreed limitation of liability, as was the case in *Colgate*. The limitation of liability prevails unless the shipper has declared a special value for his goods, or there has been wilful misconduct or its equivalent on the part of the air carrier.

The Court has already determined that Amerford is an air carrier whose entire range of operations from the time it takes charge of a shipper's goods falls within the scope of the Convention. Thus, whether Amerford is entitled to a limitation of liability, or not entitled to it because of wilful misconduct, is a matter of federal not state law. *See Lerakoli, Inc. v. Pan American World Airways, Inc.*, 783 F.2d 33, 36–37 (2d Cir.1986). Using the *I.C.C. Metals* holding to determine whether Amerford's unexplained loss amounts to wilful misconduct is inappropriate because the case is premised on state law grounds and is nonetheless specifically limited to the potential liability of warehousemen for such unexplained losses.

■ For purposes of Article 25, wilful misconduct occurs "where an act or omission is taken with knowledge that the act probably will result in injury or damage or with reckless disregard of the probable consequences." *Maschinenfabrik Kern v. Northwest Airlines, Inc.*, 562 F.Supp. 232, 240 (N.D.Ill.1983) (citing *Berner v. British Commonwealth Pacific Airlines, Ltd.*, 346 F.2d 532, 536–37 (2d Cir.1965); *Grey v. American Airlines, Ltd.*, 227 F.2d 282, 285 (2d Cir.1955), *cert. denied*, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956)). Royal offers nothing to suggest that any actions taken by Amerford, or which Amerford failed to take, resulted in the loss of the goods. Indeed, the affidavits depict reasonable security measures taken by Amerford. Royal's argument must fail because it rests entirely upon the presumption of conversion found in *I.C.C. Metals*. But because the presumption cannot be imputed to Amerford, Royal is left with nothing to support its claim that Amerford's wilful misconduct negates Amerford's right to limit its liability.

The Court's holding is consistent with the purposes underlying the Warsaw Convention. These "fundamental purposes ... are to limit liability so as to fix costs to airlines [or air carriers] at a definite level and to establish a uniform body of worldwide liability rules to govern international aviation to aid recovery by users." *Julius Young Jewelry*, 414 N.Y.S.2d at 529. The Convention also provides expressly for "consignors to avoid the damage limitations applicable to baggage [and goods] by declaring an increased value at the time of delivery." *Id.* at 530 (discussing Art. 22(2) of the Convention). IBM did not avail itself of the opportunity to declare a higher value and thus cover the full value of the goods. Had it done so, it would have been entitled to a full recovery from Amerford.

For all of the foregoing reasons, Royal's motion for summary judgment is denied and Amerford's motion for summary judg-

ment is granted. Amerford's liability for the lost goods is limited to $1,310.00.

### CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Fed.R.Civ.P. 56(a), (b). The Clerk of the Court is directed to enter judgment for the defendant and to dismiss the complaint.

SO ORDERED.