**MARTIN MARIETTA CORPORATION as successor to General Electric Company, General Electric Company, and Insurance Company of North America, Plaintiffs,**

v.

**The HARPER GROUP as successor to Circle Airfreight Corporation, Circle Freight International (USA, Inc.) and Circle Freight International, Ltd., Harper Freight International as successor to Circle Airfreight Corporation, Circle**

**Freight International (USA, Inc.) and Circle Freight International, Ltd., Circle Air Freight Corporation, Circle Freight International (USA, Inc.), Circle Freight International, Ltd. and Koninklijke Luchtvaart Maatschappij N.V. (KLM–Royal Dutch Airlines), Defendants.**

**No. 93 Civ. 7313 (RLC).**

United States District Court, S.D. New York.

Jan. 7, 1997.

---

Donovan, Parry, Walsh & Repetto, New York City (Daniel G. McDermott, John K. McElligott, of counsel), for Plaintiffs Martin Marietta Corporation, General Electric Company, and Insurance Company of North America.

Kroll & Tract, New York City (James W. Carbin, James E. Mercante, of counsel), for Defendants the Harper Group et al. and Circle Airfreight Corporation et al.

Condon & Forsyth, New York City (John F. Schutty, Stephen J. Fearon, of counsel), for Defendant KLM–Royal Dutch Airlines.

## OPINION

ROBERT L. CARTER, District Judge.

### I. Background

The dispute in this case centers on whether plaintiff Martin Marietta Corporation, successor to General Electric ("GE"), can recover under the Warsaw Convention[1] the full or

1. Convention for the Unification of Certain Rules     Relating to International Transportation by Air,

partial value of sonar equipment damaged while en route from New York to the United Kingdom. The defendants are KLM Royal Dutch Airlines ("KLM") and the Harper Group et al. as successor to Circle Airfreight Corporation et al. ("Circle"), the freight forwarder originally responsible for arranging the cargo's shipment aboard KLM.

This matter was referred to Magistrate Judge Michael Dolinger for consideration of plaintiff's motion to strike defendants' affirmative defenses of limited liability and, in the alternative, for partial summary judgment dismissing said affirmative defenses. Defendants have filed a cross-motion for partial summary judgment on the same question of whether they are entitled to assert limited liability as an affirmative defense. In his report, the magistrate judge recommended that the court grant defendants' motion for partial summary judgment, to the extent of determining that defendants' shipping waybills complied with Article 8 of the Warsaw Convention. Plaintiff has filed written objections to the magistrate's proposed findings pursuant to Rule 72, F.R. Civ.P., requiring the court to give the matter de novo consideration. Only these objections are before the court. For the reasons given below, the court adopts the findings of the magistrate.

## II. *Facts*[2]

In 1988, GE and Circle entered into a Corporate Transportation Agreement, under which Circle was to serve as GE's international air freight carrier. The agreement, which topped off a longstanding, twenty year commercial relationship between the two companies, was renewed for a second, three-year term in 1990. In November of 1991, GE arranged with Circle, pursuant to its transportation contract, to have a certain body of mine hunting sonar equipment shipped from John F. Kennedy ("JFK") International Airport in New York to its buyer, Plessey Naval Systems, Ltd., in England. On GE's instructions, (Circle's Notice of Mot.

for Summ. J., Ex. 9, Tichenor Dep. 76–77), Circle in turn contracted with KLM to transport the equipment from JFK to Heathrow Airport in London. A Circle employee executed the air waybill for its transaction with GE at Circle's office, located at 1 Johnson Road, Lawrence, New York. This waybill listed Circle's name as "the issuing carrier" and its Lawrence address and included the scheduled date of departure, KLM's name as the airline responsible for transporting the shipment, and two flight numbers marking the cargo's two-stage route from New York to Amsterdam and then to London. The waybill also included two additional addresses, one indicating Circle's corporate headquarters and the other indicating its mailing address.

GE independently arranged with a separate company, Roberts Express, to have the cargo that is the subject of this dispute delivered from GE's storage facility in New York directly to KLM at JFK. (*See* Pl.'s Notice of Mot., Ex. G., Roberts Express waybill) This cargo was consolidated with another GE shipment under a master waybill, which had been supplied by KLM and prepared by another Circle employee. (Pl.'s Notice of Mot., Peterson Dep. at 26–27, 30.) The KLM waybill included all the necessary particulars except for certain items under Articles 8(h) and (i) of the Convention which were overlooked. Pursuant to Circle's agreement with GE, the consolidated shipment was flown aboard KLM to Schiphol Airport in Amsterdam where it was transported to Heathrow. (Circle's Notice of Mot. for Summ.J., Ex. 4, McCann Dep. [hereinafter McCann Dep.] at 42.) Apparently, both stages of the shipment occurred on dates different from the ones scheduled on Circle's waybill. At Heathrow, the cargo was damaged when it fell while being unloaded into KLM's warehouse.

The Warsaw Convention presumes a carrier's liability where cargo is damaged in the

Oct. 12, 1929, 49 Stat. 3000, T.S. 876 (1934), *reprinted in* note following 49 U.S.C.A. § 40105 [hereinafter the Warsaw Convention or Convention].

**2.** With the exception of his finding concerning Circle's role in delivering the cargo that is the subject of this dispute to KLM for shipment to England, the court adopts the factual findings of Magistrate Judge Dolinger. I reiterate the facts relevant to the dispute here only for the sake of the convenience of the parties.

course of international transportation. *See* Warsaw Convention, Art. 18. Article 22(2) sets a ceiling on a carrier's liability of 250 francs per kilogram (approximately $9.07 per pound) in the event that the consignor does not subscribe to the carrier's insurance policy at the time it tenders the goods for shipment. *Id.*, Art. 22(2). Neither defendant availed itself of this insurance option and each contends that its liability for the cargo should be limited under 22(2). Relying on Article 9 of the Convention, plaintiff argues that defendants are not entitled to limited liability because both the Circle and KLM waybills were deficient under Article 8 requiring the carrier's waybills to supply certain information.[3] Plaintiff has reserved the question of whether the defendants engaged in willful misconduct under Article 25 of the Convention, which would also preclude a finding of limited liability.

### III. *Discussion*

#### A. *Circle's Compliance with Articles 8(a), (c), and (e)*

Plaintiff principally asserts that the Circle waybill omitted essential items under Articles 8(a), (c), and (e), respectively requiring the waybill to "contain ... [t]he place and date of its execution; ... [t]he agreed stopping places ... [and]; the name and address of the first carrier...." The court considers the adequacy of the waybill with respect to each of these items in turn.

#### 1). *Article 8(a)*

■ Article 8(a) of the Warsaw Convention requires the waybill to contain the "place and date of its execution." *Id.*, Art. 8(a). It is not disputed that the date of Circle's transaction with GE was properly included on the waybill. (*See* Pl.'s Objections to Report and Recommendation [hereinafter Pl.'s Objections] at 9, 17.) What plaintiff contests is the ambiguity as to which of the three Circle addresses mentioned on the face of the waybill was the actual place of execution.

The court finds that the waybill conveys the information required under 8(a). The waybill's place of execution is clearly indicated by the appearance of the Lawrence address in the box marked "name and address of issuing carrier/agent." The fact that it is not literally identified as the "place of execution" or that the waybill contains two other Circle addresses is immaterial for the purposes of satisfying Article 8(a).

#### 2) *Article 8(c)*

■ A slightly more difficult question is presented with respect to whether Circle has complied with Article 8(c), which requires the waybill to include the "agreed stopping places." Warsaw Convention, Art. 8(c). At issue is whether KLM's flight number, denoting its stopover in Amsterdam, alone suffices under 8(c). After much consideration, the court concludes that it does.

The Court of Appeals in a succession of cases has firmly established the standard for assessing whether a waybill has fulfilled the requirements of Article 8. Thus, first in *Maritime Ins. Co. Ltd. v. Emery Air Freight Corp.*, 983 F.2d 437, 440 (2d Cir.1993) and then in *Tai Ping Ins. Co., Ltd. v. Northwest Airlines, Inc.*, 94 F.3d 29, 31–32 (2d Cir.1996) and *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1033–1034 (2d Cir.1996) this circuit has directed courts to distinguish between a pure omission of an Article 8 item, which triggers full liability under Article 9, and a mere deviation in the way the necessary particulars are presented.

■ Accordingly, it is a settled proposition of law that although Article 8 specifies the substantive requirements of the waybill, it does not limit the form that the content may take or the words that may be used to meet its specifications. This is true also of Article 9, which dictates that the waybill "contain all the particulars set out in Article 8(a) to (i), inclusive, and (q)" but does not otherwise insist on any special terms or construction. Warsaw Convention, Art. 9. In other words,

---

**3.** Article 9 states:
 If the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8(a) to (i), inclusive, and (q), the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability.
 Warsaw Convention, Art. 9.

this circuit has decisively rejected the proposition that "[s]trict construction of the Convention [requires the waybill to] recite an incantation containing the magic words set out in the Article 8 particulars." *Royal Ins. Co. of America v. Air Exp. Intern.*, 906 F.Supp. 218, 221 (S.D.N.Y.1995) (Kaplan, J.). *See also Brink's*, 93 F.3d at 1035 (noting that "[a]rticle 8(e) does not designate any particular section of a waybill or any particular words which must be used to relay the required information"); *Maritime*, 983 F.2d at 440 (explaining that "[a]rticle 9 only requires that the waybill contain the [specific item]; it does not address the problem of slight deviations in the language"). So long as it has not outrightly omitted any essential item in Article 8, the waybill may be deemed to have satisfied both Articles 8 and 9. Thus, the operative inquiry is whether KLM's flight number alone constitutes a pure omission under Article 8(c). Adopting the reasoning of Magistrate Judge Dolinger, the court finds that it does not. *See Brink's*, 93 F.3d at 1034 ("In short, the operation of Articles 8 and 9 is relatively clear with respect to *pure omissions*. However, the text of Articles 8 and 9, when considered separately or together, offers little guidance as to the manner in which an air carrier must include the particulars in the air waybill. In other words, Article 9 does not address the consequences of less than strict compliance with, but more than pure omission of, the requirements of Article 8.").

The crux of plaintiff's argument is that "Amsterdam," the agreed stopping place,[4] does not appear on the waybill and that the absence of this information defeats Circle's claim to have satisfied 8(c). However flawed plaintiff may contend the waybill is does not obviate the fact that the waybill includes some information regarding the cargo's stopping place in the form of a flight number indicating that Amsterdam was the interim

destination before the shipment reached Heathrow. Hence, although it may not rise to the level of information literally required by 8(c), the flight numbers are not so insufficient that they may be regarded as a pure omission.

Turning to the question of whether this flight information suffices under 8(c), *Brink's* again is instructive. There the court determined that the fact that the waybill had referred to the carrier's timetables for the agreed stopping place discharged 8(c)'s requirement. *Brink's*, 93 F.3d at 1035. Although Circle's waybill does not expressly incorporate KLM's timetable, the court can see no principled basis for distinguishing *Brink's* from the instant case. Equipped with the name of the airline and the flight number, plaintiff could have ascertained the cargo's route through Amsterdam just as easily and in just the same way as if the waybill had itself expressly referred plaintiff to KLM's flight schedule. Even without a timetable plaintiff could have learned the cargo's itinerary by relying on the flight number, itself a clear indication of the cargo's nonstop route to Amsterdam. (*See* Circle's Notice of Mot. for Summ. J., Ex. 12, Luber Dep. [hereinafter Luber Dep.] at 47; Ex. 11, KLM's 1991 timetable). This outcome is consistent with the principle espoused by the Court of Appeals in *Tai Ping* that the waybill must "effectively convey[ ] the necessary information." *Tai Ping*, 94 F.3d at 32.

Nor is it fatal to Circle's defense under the reasoning of *Tai Ping* that the cargo was transported to Amsterdam on a date different from the one that was previously scheduled. In *Tai Ping* the Court of Appeals decided to deny limited liability to a carrier on the grounds that its waybill had supplied the incorrect departure date and flight number, thereby inadvertently referring plaintiff to the wrong timetable. *Id.* at 32–33. One

---

4. Defendants somewhat disingenuously suggest that they never agreed to Amsterdam by asserting that "GE unilaterally directed the routing of the shipment on KLM through Amsterdam." (Defs.' Supplemental Mem. of Law in Opposition to Pl.'s Mot. to Strike Affirmative Defenses [hereinafter Defs.' Supplemental Mem.] at 7, note 5.) This argument does not hold water. In its briefs, Circle itself repeatedly attests to an understanding it had with GE that the shipment was to be flown by KLM to Amsterdam. (*See* Def. CAC's Response to Pl.'s Objections to Report and Recommendation of Magistrate Judge Michael H. Dolinger at 5–6; Defs.' Supplemental Mem. at 3.) This is enough to infer that both Circle and GE had agreed to Amsterdam as a stopover destination.

critical factor weighing in defendant's favor distinguishes *Tai Ping* from the instant case: the flight number included on Circle's waybill reflected the cargo's planned and actual route to Amsterdam. In *Tai Ping,* the cargo had been transferred, without notice to the plaintiff, to an entirely different flight at Narita, Japan, the stopping point unspecified in the waybill. *Id.* at 33. Thus, although the waybill had incorporated the airlines' timetables, "the timetables referred to did not apply to the transportation of Tai Ping's shipment." *Id.* Significantly, the plaintiff in *Tai Ping* had no means for tracking its cargo, a predicament not manifested in the instant case. *Id.*

Moreover, it bears emphasizing that all KLM flights out of JFK bound for London Heathrow during the November, 1991 time period first stopped at Schiphol Airport, (Luber Dep. at 44–45), and that GE was in fact well aware of the cargo's intended route through Amsterdam, (*see* McCann Dep. at 42; Circle's Notice of Mot. of Summ. J., Ex. 16, fax transmittal.) Hence, GE was assured both in theory—by virtue of its having shipped the equipment aboard KLM from JFK—and, in fact—by virtue of its independent knowledge of KLM's itinerary—that its cargo would stop in Amsterdam and, therefore, that the "contract of carriage … [would] include a stopover in another sovereign." *Id.*

Decisions in this circuit and the drafting history of the Convention make it clear that the overarching purpose of Article 8(c) is to notify the consignor of the international nature of the transportation. *See Brink's,* 93 F.3d at 1034–1035 (citing Minutes, Second International Conference on Private International Law, October 4–12, 1929, Warsaw 248–49 (R.C. Horner & D. Legrez trans. 1975) (containing *Report of the International Technical Committee of Aeronautical Legal Experts on the Preliminary Draft of a Convention relating to documents of air carriage by aircraft* )). The listing of KLM as the airline and of its flight number—easy reference points for the carrier's actual timetables and, therefore, a ready indicator of the international character of the route—plainly effectuates this purpose. Accordingly, the court is satisfied that defendant's waybill meets the requirements of 8(c).

### 3). *Article 8(e)*

Plaintiff disputes Magistrate Judge Dolinger's finding that Circle's name and address, listed on the waybill as that of the "issuing carrier," suited Article 8(e) which requires the waybill to contain the "name and address of the first carrier." Warsaw Convention, Art. 8(e). The nub of plaintiff's objection is that the phrase "first carrier" necessarily refers to the first *air* carrier and that Circle does not qualify because it only arranged for the shipment aboard KLM and never itself transported the cargo. (Pl.'s Objections at 13.) The court agrees with the reasoning set forth by Magistrate Dolinger.

Both parties apparently concede that defendant Circle is a "carrier" under the Warsaw Convention. Plaintiff's complaint plainly acknowledges—and Circle has not contested—that defendant is a carrier, presumably to enable plaintiff to sue under the Convention. *See Pflug v. Egyptair Corp.,* 961 F.2d 26, 31–32 (2d Cir.1992) (concluding that Article 17 claim for personal injury would not lie against non-carrier defendant); *Kapar v. Kuwait Airways Corp.,* 845 F.2d 1100, 1102–1104 (D.C.Cir.1988) (dismissing personal injury claim for lack of subject matter jurisdiction on grounds that defendant was not a carrier under the Convention). Circle's waybill indicates that the air freight company is a "carrier," (Pl.'s Notice of Mot., Ex. D, Conditions of Contract, ¶ 1), as does the parties' Corporate Transportation Agreement, (Circle's Notice of Mot. for Summ. J., Ex. 2), the contract which governs the provision of Circle's international transportation services to GE. *See Royal Ins. v. Amerford Air Cargo,* 654 F.Supp. 679, 682 (S.D.N.Y.1987) (Cannella, J.) (factors considered by court for adjudging whether an air freight forwarder is an indirect carrier include "'the way the party's obligation is expressed in documents pertaining to the agreement, … [and] the history of dealings between the parties,'" *quoting Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. 268, 273 (S.D.N.Y.1980) (Conner, J.) (citations omitted in original)).

■ This treatment of Circle comports with federal aviation law, which historically has recognized two classes of carriers, direct and indirect. *See DHL Corp. v. C.A.B.,* 584 F.2d 914, 915 (9th Cir.1978); *C.A.B. v. Care-free Travel, Inc.,* 513 F.2d 375, 387 (2d Cir. 1975); *Monarch Travel Services, Inc. v. Associated Cultural Clubs, Inc.,* 466 F.2d 552, 554 (9th Cir.1972); *Railway Exp. Agency, Inc. v. C.A.B.,* 345 F.2d 445, 448–450 (D.C.Cir.1965); *see also C.A.B. v. Aeromatic Travel Corp.,* 489 F.2d 251 (2d Cir.1973) (distinguishing generally between direct and indirect carriers). Ordinarily, direct carriers perform the actual transportation, while indirect carriers provide supportive services, including procuring and assembling cargo for shipment, consolidating multiple shipments into a single shipment for carriage, and arranging transportation with the direct carrier. *See DHL Corp.,* 584 F.2d at 915.

Courts have borrowed the concept of indirect and direct carrier classes from domestic federal aviation law and incorporated it into the realm of the Warsaw Convention. In *Royal Insurance* this court determined that an air freight forwarder was an indirect carrier and, therefore, could invoke the same limited liability protection afforded under the Warsaw Convention to direct air carriers. *See Royal Insurance,* 654 F.Supp. at 682; *see also Confeccoes Texteis de Vouzela, Lda. v. Space Tech Systems Inc.,* 972 F.2d 1338, No. 91–35047, 1992 WL 170964, at * 2–3 (9th Cir. July 22, 1992) (holding that freight forwarder that had arranged air transportation of cargo aboard actual air carrier was indirect carrier under Warsaw Convention); *Hitachi Data Systems Corp. v. Nippon Cargo Airlines Co., Ltd.,* No. C–93–2456, 1995 WL 16923, at * 5–6 (N.D.Cal. Jan. 6, 1995) (same); *Pan American World Airways, Inc. v. C.F. Airfreight, Inc.,* No. 89 Civ. 4182, 1990 WL 240947, at * 1 (S.D.N.Y. Dec. 28, 1990) (Griesa, J.) (concluding that air freight forwarder was a carrier within the meaning of the Convention). *Cf. Sega of America,*

*Inc. v. A.M. Exp. Freight, Inc.,* Nos. 92 Civ. 5838, 92 Civ. 8382, 1995 WL 577784, at * 3 (S.D.N.Y. Sept. 29, 1995) (Martin, J.) (observing that agents of freight forwarders may qualify for liability limitations under Warsaw Convention). In short, for purposes of being a carrier, it is insignificant that Circle did not actually transport the cargo, either by air or otherwise, since an indirect air carrier by definition need not be involved in the physical transportation of the goods.

Thus, the question remains whether Circle as a "carrier" and as apparently the "first" to deal with General Electric by arranging shipment of its equipment is nevertheless precluded from being a "first carrier" specifically under Article 8(e) because it never actually transported the goods. Preciously few cases have addressed this narrow question.

Regrettably, the text of the Convention offers little guidance for resolving this question. Nowhere does the Convention define "first carrier." Nor are any of the Convention's other provisions helpful. The phrase appears in relevant part[5] only once again in Article 30(3), which states that

[a]s regards baggage or goods, the passenger or consignor shall have a right of action against the first carrier, and the passenger or consignee who is entitled to delivery shall have a right of action against the last carrier, and further, each may take action against the carrier who performed the transportation during which the destruction, loss, damage, or delay took place.

Warsaw Convention, Art. 30(3). Nothing in Article 30(3) offers any basis for inferring that the "first carrier" must transport the cargo. Indeed, this must have been plaintiff's assumption when it decided to sue Circle. As Magistrate Dolinger observed, plaintiff's complaint is premised on a supposed right of action under Article 30(3) against both Circle as the "first carrier" and KLM as

---

5. The phrase "first carrier" also appears in Article 30(2) with respect to passenger injuries. However, this too is unilluminating for the court's purposes. Article 30(2) provides that

[i]n the case of transportation of this nature, the passenger or his representative can take action only against the carrier who performed the transportation during which the accident or the delay occurred, save in the case where, by express agreement, the first carrier has assumed liability for the whole journey.

Warsaw Convention, Art. 30(2).

the carrier in charge when the damage occurred.

The interpretation of Article 8(e) that plaintiff proposes can cause nothing but mischief. Were the court to adopt this view, it would produce the anomalous result of permitting Circle to be sued as a carrier under the Convention while at the same time disqualifying it from being a "first carrier" despite the fact that chronologically it was the first to deal with GE. The Convention certainly does not compel this result and there is no other solid basis for reaching such a conclusion.[6] Thus, the court agrees with the *Royal Insurance* court when it stated that "[t]here is no logical reason to deny [the freight forwarder] resort to the Convention solely because it does not undertake the functions of air carriage directly, especially as the Convention does not differentiate between direct and indirect carriers, or otherwise define air carrier." *Royal Insurance*, 654 F.Supp. at 683. *See also Hitachi*, 1995 WL 16923, at * 5–6 (holding that freight forwarder's name and address—rather than the name and address of the actual air carrier—

met the requirements of Article 8(e)). Logically it follows that an entity which is a "carrier" under the treaty is the "first carrier" if it was the first to transact with the consignor by arranging transportation for the cargo aboard the direct carrier. Magistrate Dolinger correctly articulated this point in his report.

Finally, plaintiff contests Circle's use of "issuing carrier" instead of "first carrier." For reasons already stated, this argument is without merit. Article 8(e) only specifies the content of the waybill; it does not require an exact phrasing. Therefore, "issuing carrier" sufficiently conveys that Circle was the "first" to conduct its business with GE.

### B. *KLM's Compliance with Article 8(i)*

■ According to Article 8(i), the waybill must contain the "weight, the quantity, the volume, or dimensions of the goods." Warsaw Convention, Art. 8(i). Plaintiff concedes that the waybill listed the weight of the total consignment. At issue is whether the ab-

---

6. Plaintiff relies heavily on a passage from *Maritime* which it has quoted out of context to bolster its proposition that a "first carrier" must transport the cargo. Specifically, plaintiff misconstrues the *Maritime* court's meaning when it stated that "[n]o confusion can possibly arise as to the meaning of ... " '[t]he name and address of the first carrier.' " *Maritime*, 983 F.2d at 440–441. In *Maritime* the issue was whether defendant Emery, a freight forwarder, could invoke limited liability for cargo that had been lost while en route from Panama to Toronto. Emery had scheduled the cargo to be transported by air aboard a direct carrier, Pan American Airlines. Finding for the defendant, the district court concluded that the plaintiff had not borne its burden of demonstrating that the omitted particulars on Emery's waybill were "commercially significant" so as to deprive the defendant of limited liability.

On appeal, the circuit court determined that the lower court had incorrectly applied the "commercially significant" test to Articles 8(a), (c), and (e). Reasoning that the test was an "interpretive technique" which was to be employed only to give meaning to ambiguous provisions of the Convention, the court held that its application should be limited to the more cryptic Articles 8(h) and (i). *Id.* at 440. These provisions trigger the test because they contain a "conjunctive-disjunctive ambiguity" that make it unclear whether they "should be read to require one or all of the listed items." *Brink's*, 93 F.3d at 1033. Thus, in the text quoted by plaintiff the

*Maritime* court was merely stating the obvious point that "[n]o confusion can possibly arise" as to the meaning of Articles 8(a), (c), and (e) because none of these pose the interpretive problem raised by Articles 8(h) and (i). The court was not, as plaintiff insists, stating that the name and address of the first carrier must unequivocally belong to the first carrier to transport the cargo by air. Read in the way in which it was intended, nothing in this quoted passage remotely supports the interpretation plaintiff urges upon the court.

Plaintiff also seeks to rehash its argument that the factual similarity between *Maritime* and the instant case warrant a finding in its favor because the court there had decided that the actual air carrier, not the freight forwarder, was the "first carrier" under Article 8(e). As pointed out by Magistrate Dolinger, *Maritime* differs from this case in one critical respect: in *Maritime* both parties had stipulated to the waybill's omission of the particulars required under Articles 8(a), (c), (e), and (i). Thus, the identity of the "first carrier"—either Emery as the party that issued the waybill and arranged for transportation of the cargo aboard Pan Am or Pan Am as "the carrier during the initial leg of the trip," *Maritime*, 983 F.2d at 439—was never directly considered by the court. Moreover, the factual record is far too sketchy to draw any independent conclusions about Emery's status for the purpose of deciding this case.

sence of the damaged cargo's individual weight divests KLM of limited liability.

Since *Exim Industries, Inc. v. Pan American World Airways, Inc.,* 754 F.2d 106, 108 (2d Cir.1985) established the "commercially significant" test—permitting courts to disregard the omission of nonessential Article 8(h) and (i) items from the waybill—only one other case in this circuit has squarely confronted the specific question of whether the weight of an individual package, versus the gross weight of the entire shipment, must be included under 8(i). In *Arkwright Mut. Ins. Co. v. KLM Royal Dutch Airlines,* 1995 WL 491490, No. 94 Civ. 0174, at *4 (S.D.N.Y. Aug. 17, 1995) (Mukasey, J.) the court considered whether by listing only the collective weight of a shipment, defendant could be barred from invoking limited liability for a single, lost container. Concluding that the "commercial significance of listing weight on an air waybill is that it provides the basis for assessing the freight charges," the court determined that the omission of weight information for the single container was inconsequential for 8(i)'s purposes as it did not prevent the shipper from calculating the total cost of the shipment. *Id.* By the same token, the absence of the individual weight of the sonar equipment in this case did not preclude plaintiff from assessing its freight costs which were based on the total weight of the shipment.[7] (*See* Circle's Notice of Mot. for Summ. J., Ex. 14, KLM air waybill.) Because the omitted information is not commercially significant, KLM has met the requirements of Article 8(i).

For the foregoing reasons, the court adopts the recommendation of Magistrate Judge Dolinger and grants defendants' motion for summary judgment, subject to the applicability of Article 25 of the Convention which bars parties from availing themselves

of limited liability if they have engaged in willful misconduct.

**IT IS SO ORDERED.**

---

7. According to *Arkwright* a secondary purpose of including weight information is to "'assist the [consignor] ... in calculating the carrier's liability for loss.'" *Arkwright*, 1995 WL 491490, at *4. However, as that case also explains, it is not essential that the waybill itself include such information if it can be gleaned from other sources. *See id.* ("Plaintiff admits that the weight of the missing container is available from sources other than the air waybill, and thus that the carrier's liability can be calculated."). Thus,

plaintiff's broad assertion that "[i]t is impossible to ascertain from the KLM air waybill the weight of the towed body" and, therefore, that "damages under Article 22 based on the weight of the damaged piece cannot be calculated," (Pl.'s Objections at 19), is unsatisfactory without a further explanation as to why the weight of the damaged individual cargo cannot be extracted from other documents that plaintiff undoubtedly has at its disposal.